May it please the court, James K. Fett, on behalf of the plaintiff, I reserve five minutes. You may, please proceed. I'm going to go out on a limb here and tell you that I believe that our position stated in the briefs as well as the merits of this appeal are so clear that you don't need to hear oral argument from me. Unfortunately, it has been my experience that courts do not always agree with me on these things. So I would like to open myself up to questions, just in case you don't think it's as clear as I do. Can I address any questions? I would not assume the lack of questions to mean we agree with you. I understand, Your Honor. How do you How do you show that any particular comments that were made over the years or How do you show that that's what motivated the decision in this case where there are very clear contemporaneous objective reasons for the decision to choose the other firm? Because we have direct evidence in the form of a declaration from the city manager who had a bird's eye view to everything that was going on. Because we have the same decision maker, that is, Mayor Hampton, saying the same things beginning in 2003 that you see in the affidavit of Ms. Kohlberg. He wants black contractors. But there's only one... Okay, he said it back then, but he didn't do anything about it. I mean, he didn't substitute... Well, he didn't have the votes to do it, and he didn't have the composition. He didn't have the composition of the city council to do it. But that goes to... You found any case where we go back nine years for a stray comment? Of course, if that was all I had, I would lose, Your Honor. But the law tells you you need to look at the evidence, not in isolation, but cumulatively. I got that. But even cumulatively, have you found a case where they relied upon a statement somebody made nine years before the incident? Actually, there's a case called Cooley v. Carmike where they relied on a statement. This court relied on a statement. It was an age case, but they relied on a statement by the decision maker when he was a kid that he didn't like old people and they should go to a concentration camp. So ordinarily, is that an issue if there's nothing else? You bet, Your Honor. But when you place the comment in context and you have all this other evidence, then it's highly relevant. And I think I put together a pretty good string of evidence dating back to, like, 1983 when they came up with a statute. This is not the first time that this has happened to a contractor or employer or, excuse me, employee at the city of Inkster. Well, first of all, how do you show that it tainted? The mayor isn't the only one that had a vote. How do you show that it tainted the whole process when you have individual people saying, I kind of went in his favor, but, you know, I mean, his attitude was this or he falls asleep in meetings. And I mean, how do you show that none of that was the reason, that that's all pretextual? If that was an issue, no plaintiff could ever prove one of these cases. The law says that we have to show that the person making the offending statement had influence, not the determinative influence, but if he has influence in the decision-making process, then that, in this case, would be direct evidence. And it's not only Mayor Hampton. If you look at the affidavit of Ms. Capella, she refers to not only the mayor, but city council members saying that they want black contractors, they want to know the composition of the contractors that are coming before them. So it's not just Mayor Hampton. And beyond the statements of Mayor Hampton, we have an ordinance that, frankly, has no business being on the books. But there's no evidence that they were acting pursuant to any ordinance. Well, if you assume that you just have an ordinance on the book and you ignore it, that's a defense position. Why wouldn't you ignore it if it's been declared unconstitutional by the Attorney General? Because they don't care. The city of Inkster doesn't care if it's unconstitutional. They're going to do it anyway because they want black contractors. Well, maybe they're going to do it anyway, but that's different than saying they're going to do it because of an ordinance. We can't find any evidence that the ordinance came into play here, other than the fact that, apparently, at one point it was on the books. It was on the books. There's no direct evidence that they actually said, we're going to follow this with regard to Milk's bacchogeny. But the cases that I cited in my reply brief say that if you have facially discriminatory policy, like they did in the TWA case, that that's direct evidence. So if the legislature passes a statute and, for whatever reason, it's declared invalid by courts, does the legislature then have to go back and formally revoke or repeal that statute? No, they don't. It's just void, right? You would think. But my point, Judge, is you're exactly right. But if a municipality or a county continues to follow this unconstitutional policy, that's even more evidence that they don't care about constitutional rights. They're going to use race or gender or whatever illegal factor to do what they want. But you have to close the loop by showing us evidence that said that what they did was, in fact, following this unconstitutional policy or even motivated by the unconstitutional policy. And, at least in my case, I'm having trouble finding that. I would concede that there is nothing other than the existence of the policy. But throw that out. Throw that piece of evidence out. And I don't think you should, but throw it out. Once we throw it out, then it sounds like what you were saying in answer to Judge White's question is now you're advancing a cat's paw theory, that because the mayor has some sort of influence and because he was prejudiced against Whites, therefore, that infused the decision-making process of the legislative body and violated your client's rights. But you didn't plead a cat's paw theory. Well, it isn't a cat's paw theory because it's undisputed that the mayor had a vote. It's undisputed that the mayor was a moving force here. So he had influence. Not only that, the city council. I have evidence. I don't know how you can ignore the Declaration of Ancapella because it says there city council expressed the desire to have Black contractors. They asked about the racial composition of the people. But don't you have to show that at various times, let's say that they did that, don't you have to show that that's what was involved in this case? Don't you have to show that that's why they didn't renew it as opposed to cost savings and a whole lot of other things? Because otherwise this city could never hire a Black contractor over a White contractor or even a firm that had one Black over a firm that had no Blacks because everything they would do from now on would be tainted, and that would be it. Well, we also have Capella's testimony, her opinion testimony based on clear underlying facts that that's exactly what Hampton did. But the standard you're seeming to impose is not the one. It would seem that we could never have a case, what I call, and I hate to say it, a reverse discrimination case. Well, you could. It's the same problem. I mean, even if it weren't a reverse discrimination case, if you just flip the races, you'd have the same problem because ultimately you can't get around the evidence that the other firm gave more expertise for less money and that there were objective complaints about your client. I mean, I don't know how you get. That's highly contested. And, you know, whether it's the cost justification that they use, whether it's the more capacity evidence they are citing, that's not uncontested. And we set forth good reasons why some of it is just not true. That's one way of doing it. Another one is that's not really what motivated them. Another is that it's insufficient to warrant the action. Well, here, look at some of the reasons that they're justifying the termination. Hampton says he let that guy have the unauthorized information. The guy's been convicted of a felony for doing it. Hampton says he didn't get the information from the local district court. Well, it's not even clear whether he was even asked to do that. And another guy says, yeah, he did the best he could to get the information. So, I mean, every one of these reasons cited, whether you talk about costs, it's after the fact, but the cost of the matter is it was far more expensive to have the Allen brothers. And Capella says that in her statement. I'm waiting for you to take a breath. You'll have your rebuttal. Thank you, Your Honor. Good morning. May it please the Court, Cindy Klingler appearing on behalf of defendants, City of Inkster and Hilliard Hampton. Why don't you have a problem when the record is replete with statements that there's a desire to have as many black contractors as possible to replace the white providers and to support the community? I mean, why isn't it a problem? Those are no evidence of discrimination in this case, for one thing, because those statements made by Hilliard Hampton, allegedly made by him, were made some, as Judge McKeague noted, some nine years ago, in connection with a minority preference ordinance. Those were not statements made out of the blue. Mr. Hilliard Hampton testified that if he made those statements, he made them in connection with the minority preference ordinance. That is not contradicted in the record. In fact, all of the other evidence suggests that those statements were made way back in time, and that's consistent with his statement that they would have been made in connection with the minority preference ordinance. That's why they have no causal link to the decision to terminate Mr. Spikagny's contract. And what about the statement to Ann Capella about the actual person involved to make sure that he got the contract? I believe that that statement has absolutely no reference to race. It may be that Mayor Hilliard Hampton had a preference for the Allen Brothers Law Firm, which, of course, is not a minority law firm. It has one minority member out of six. But that statement is similar to the statement that the council made about the auditor, where the Councilman Caney said, we're hiring this person. We're not hiring anyone but him. That's a statement of personal preference for an individual. It's not a statement that has any reflection on race. Let's step back for a second. I'm at least interested in this because there's an underlying theme here that government preferring certain groups is, I guess, per se, unconstitutional. But the reason I'm asking the question is, don't we to this day have the very federal government in which we're all sitting here this morning having many preference programs where they're preferring people based on gender and minority ownership or race and minority ownership? That's not per se unconstitutional, is it? I'm afraid I'm not prepared to answer that question. We have proceeded on the theory of whether this is race discrimination. That's what I'm saying. I'm asking that question because government having a preference, it seems to me, at least is arguably, whether you agree with that or not, is at least arguably different than whether somebody was discriminated against in connection with the termination of a contract based upon their race. I'm just asking, generally speaking, even if they preferred to have minority contractors, assuming that they are better qualified, is that wrong? She's not going to let you trap her. It could be a problem in Michigan. Well, she paused. Maybe she was going to answer. No, the city can't. Judge White is saying maybe it is a problem in Michigan because we have a constitutional amendment. You can't reject this candidate because he's white and hire another one because he's black. I think that's the state law. Here's my question. Did any of this amount to more than putting out notice, asking for proposals, and saying at the bottom, as they often do, minority-owned and women-owned businesses are encouraged to apply? Was it ever stronger than that? I don't think it was any stronger than that. I think that the evidence shows that this decision was made based on legitimate business reasons. The evidence is overwhelming, in fact. All of the city council members testified as to their reasons for choosing the Allen Brothers Law Firm. Those reasons were the breadth of skills and depth of skills and abilities, and that they felt that that would be a more economical alternative. They also felt there were really two theories going. One was that they would be a more economical alternative if they handled only the same matters that Mr. Sukoshne was handling. The second was that they would sort of get an out-of-control situation under control by having the Allen Brothers Law Firm handle more city matters. So not necessarily that they would be cheaper, but they would sort of gain control of a spiraling situation. But wasn't it also true that Allen Brothers had done this same kind of work for half a dozen other municipalities? Yes, the Allen Brothers had excellent qualifications. We would ask the court, and they were an ambitious candidate. I think that makes a difference between Mr. Sukoshne and the Allen Brothers. They really pursued this contract where Mr. Sukoshne said to certain city council members, I just want to stay on for two or three more years, and he felt entitled to that position. I think that that was a very legitimate reason that was never rebutted in the record why the city council and the mayor would choose the Allen Brothers Law Firm. Well, I have one final question. I noticed you also used the terminology terminated. I know that they asked for proposals. There was this program saying everybody's got to submit a proposal to get a contract. So was this a case of terminating his contract or simply failing to renew his contract? I think that would better be characterized as failing to renew his contract. I'm not sure if he had a contract that renewed every year that was renewed. I don't know the answer to that, to tell you the truth. Did he have a written contract? He did have a written contract at one point. Did it have a termination date in it or not? I am not certain of that standing here. Did you handle the rest of the case, the Wayne County case? No, the Wayne County case? Wasn't part of the case remanded? Oh, part of this case, the contract case, was remanded to Wayne County. No, I did not handle it. I handled some redisposition in the district court and the appeal. So there is a separate strictly contract issue that's going on, and unfortunately I'm not as familiar with that as I'd like to be. Well, doesn't it make a difference, at least arguably, if they cut off his contract in midterm versus it became due and they chose not to renew it? I don't believe it does because this is the case. Well, where does he get the right to renewal? You have to be depriving somebody of some right that they had, in this case, based on race. If he has an ongoing contract and they take it away, okay, we get that. But if the contract was up for renewal and they declined to renew it, where is he being even deprived of a right that he had based on race or otherwise? If the contract was up for renewal, I'm afraid I simply can't answer that question. All right, fair enough. Anything further? Well, I think that I've answered most of the judge's questions, to your satisfaction. I think that what we have here is a plaintiff who worked for the city for 29 years. He worked with Mayor Hampton, who's alleged to be the moving force in this decision to hire a new city attorney, worked with Mayor Hampton for 21 years. I don't think that – I think if there were race discrimination to have occurred, it certainly would have occurred before 2011. See, now you're saying things that you can't possibly know when you say he worked for the mayor. Well, did he have a contract? We don't know. Was the contract with the mayor? Was the contract with the city? The contract was with the city. Did the city contract say that he took directions from the mayor? Does he take directions from the mayor? He takes directions from city council, and the mayor is considered as a member of city council.  Worked for the council. He worked with the mayor. There you go. Big difference. Yes. I'll conclude that I think that this record overwhelmingly supports the legitimate reason and supplies no evidence that either the minority preference ordinance or any statements of Mayor Hampton made some nine years ago were a cause or a motivating factor in the decision to replace Mr. Spikoshny as city attorney. Did you have further questions? Judge, he was just pointing out an allegation in the complaint that said that his contract – they refused to honor his contract that required 90 days advanced written notice, apparently, to terminate. Yes, we would – So did they terminate the contract without having given the 90 days notice? Our contention is that the issuance of the request for proposal was a 90 day notice. And then by the time that they got around to awarding the new contract, had 90 days passed? You could send out an RFP and then you could award it the next day and you wouldn't meet the 90 days. No, it wasn't the next day. And I believe it would have been 90 days, but I can't answer that with certainty. All right. Thank you, Your Honor. But what about the allegation that he wasn't even invited to interview? I think this has to do with the fact that the Allen brothers was in close communication with the city, and so they knew what was going to happen at a city council meeting. I think that's as simple as that. Where Mr. Spikosny maybe wasn't in that kind of – wasn't having that kind of communication with the council members at that time. Why do you need to have communication? Isn't there an agenda? Don't you have to post the agenda? You just don't know what happened here, do you? Well, certain things aren't clear from the record. All right. Thank you, Your Honor. I'd first like to address your point, Judge McKeague, and no, it is not okay for the government to have a preference program, especially here where there's no evidence of past discrimination against the African Americans. They've been running the municipality since 1970, and I would direct you to your opinion in Rutherford v. City of Cleveland. There you looked at past discrimination, past judicial findings, and admission by the city in a consent decree. We don't have any of that here, okay? So there is absolutely no basis for them to be making any decisions based on race. Well, you're looking at cases that deal with consent decrees or judicial decrees entered into to remediate past discrimination. That's not this case. Well, what I'm saying is you can't do racial preferences unless it can pass strict scrutiny. Strict scrutiny is not present here. Fair enough. So did your guy have a contract? My guy had a contract. Was it an evergreen contract? In other words, it lasted forever unless he got 90 days notice? Yes. Why isn't an RFP notice? If they request proposals to do this job, why isn't that a notice that they're considering terminating his contract? For the same reason that Judge Tarnow said in the record below, which is potentially terminating his contract is not terminating the contract. And that was issued in January, Your Honor. They didn't terminate the contract until July 18, 2011. That doesn't really help you if the RFP is notice. It is notice. He got his 90 days in, and then the contract was terminated. If it was 90 days, then he would have been done a lot earlier. He would have been February, March, April. He would have been done April if that was notice. But you're not seeking some portion of 90 days. We are in the Wayne County Circuit Court case. That's pending. All right. So we don't have to worry about that. Okay. Let me start with the statement that these remarks by Hampton are old, too old to be considered. And I want to point out that if you look at Ann Capella's affidavit, she was the city manager from 2008 to 2011. So that's when these statements were being made, not just in 2002. Yes, were they being made then? Yes. Yes, they were. Between 2002 and 2008, oh, yes, they were. But Capella's affidavit is clear that it was 2008 to 2011 that she was hearing this, on a regular basis. One thing that bothers me that let me just lay it out and then give you a chance to respond to it. Under your theory, if we assume that there was some racial preference or animus going on here, let's assume for our discussion that there is, it seems to me that it would be impossible for the city to terminate your client's That's not true. How can they replace him with an African-American, even if eminently better qualified, which I'm asking you to assume for purposes of our discussion, because it would be infused with racial discrimination under your theory. You still have to prove your case. You still have to have somebody saying it was the standard operating procedure for them to ask everybody that came before them whether or not they had minorities in the firm, what percentage. It was standard operating procedure for them to talk about how they preferred minority candidates. There's been lots of cases, whether it's age, race, gender, where simply replacement by the person in the protected characteristic or outside the protected characteristic does not make your case for you. And that's the same true here. That's also true here. I guess my time is up. Thank you. Thank you. Thank you. Interesting case. The case will be submitted. Please call the last case.